IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| WENDELL K. CROWLEY, | ) | Civil Action No.: 4:10-1344-MGL |
| | ) | |
| Plaintiff, | ) | **OPINION AND ORDER** |
| | ) | |
| v. | ) | |
| | ) | FINDINGS OF FACT |
| UNITEDHEALTH GROUP INCORPORATED | ) | AND |
| and SEDGWICK CLAIMS MANAGEMENT | ) | CONCLUSIONS OF LAW |
| SERVICES INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

Through this action, Plaintiff Wendell K. Crowley ("Crowley") seeks a determination that Defendant Sedgwick Claims Management Services ("Sedgwick") abused its discretion when it denied Crowley's claims for short-term disability ("STD") benefits and long-term disability ("LTD") benefits under his former employer Defendant United health Group Incorporated's ("UnitedHealth") employee benefit plans ("The Plans"). The Plans are governed by the Employment Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001et.seq. (ECF Nos 27-1 at 30 & 1-1 at 3). UnitedHealth is the Plans' administrator. (ECF No. 27-3 at 4). UnitedHealth delegated its discretionary authority to interpret the Plans and make claims determinations to Sedgwick.

In this matter, Crowley seeks STD and LTD benefits from Defendants for the period beginning on July 1, 2009, pursuant to 29 U.S.C. § 1132 (a)(1)(B) as well attorney's fees and costs under 29 U.S.C. § 1132(g)(1).[1]

_____

[1]Plaintiff filed this action in the Florence County Court of Common Pleas on April 20, 2010. On May 21, 2010,Defendants removed this action pursuant to 28 U.S.C. § 14411.

The matter is currently before the court for a determination on the merits based on the parties' written submissions and oral arguments heard on September 3, 2013. (ECF Nos. 28, 29 & 59). The parties filed a joint stipulation and memoranda in support of judgment pursuant to the court's Specialized Case Management Order for ERISA benefits cases. (ECF No. 27). The parties agree the court may dispose of this matter consistent with the joint stipulation and memoranda. (ECF No. 26 ¶ 8). The parties stipulate that Crowley has exhausted his administrative remedies as to his claim for STD benefits but dispute whether Crowley has exhausted his administrative remedies as to his claim for LTD benefits. (ECF No. 26 at 1-2).

On July 7, 2011, the parties filed cross-memoranda in support of judgment. (ECF Nos. 28 & 29). Responsive memoranda were filed on July 21, 2013. (ECF Nos. 30 & 31). All memoranda rely on the evidentiary record filed on June 27, 2011. (ECF No. 27).

For the reasons set forth below, the court finds Sedgwick did not abuse its discretion in denying Crowley benefits.

## DECISION OF THE COURT

After reviewing the administrative record, the joint stipulations, and parties' memoranda, the court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any findings of fact represent conclusions of law, or vice-versa, they shall be so regarded.

## FINDINGS OF FACT

### 1. Plan Language

#### A. STD Plan

The STD summary plan description ("SPD") provides that the STD Plan's

2

". . . benefit payable is generally 60% of your Predisability Earnings . . . ." (ECF No. 27-4 at 47). If a participant has purchased supplemental STD coverage, the STD Plan pays a benefit of 80% of the participant's predisability earnings. *Id.* The STD Plan defines "disabled" as an inability "to perform with reasonable continuity the Material Duties[2] of one's Own Occupation[3] because of a non-work related Medical Condition."[4] *Id.* at 61. The STD Plan explains that a participant is disabled when all of the following conditions have been met: (1) the participant has been seen face-to-face by a physician about his or her disability within 10 business days of the first day of absence related to the disability leave of absence; (2) the physician has provided medical evidence that supports the participant's inability to perform the material duties of his or her occupation; (3) the participant is under the regular and appropriate care of a physician; and (4) the disability is not work-related and is a medically determinable impairment.[5] *Id.* at 53.

---

[2]"Material Duties" are defined by the STD Plan and the LTD Plan as "The essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted . . . ." (ECF No. 27-4 at 38 & 62).

[3]"Own Occupation" is defined by the STD Plan as "Any employment business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for UnitedHealth Group when your Disability begins. In determining your Own Occupation, the Plan Administrator is not limited to looking at the way you perform your job for your employer but may also look at the way the occupation is generally performed in the national economy. If your Own Occupation involves the rendering of professional services and you are required to have a professional or occupational license in order to work, your Own Occupation is as broad as the scope of your license." *Id.* at 63.

[4]"Medical Condition" is defined by the STD Plan as an "Illness, Injury, pregnancy, Mental Disorder and substance abuse or dependence." *Id.* at 62.

[5]"Medically Determinable Impairment" is defined by the STD Plan as "An impairment that results from anatomical, physiological or psychological abnormality which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by Medical Evidence consisting of signs, symptoms and laboratory findings, and not only by the individual's statement of symptoms." *Id.*

If a participant qualifies for STD benefits, the benefits may be paid for up to 180 days.  *Id.* at 54.  Coverage under the STD Plan automatically ends at the earliest of:

- The date specified, if UnitedHealth Group terminates the STD Plan for any reason;

- The date the participant's employment with UnitedHealth Group ends;

- The date the participant fails to pay required contributions when they are due;

- The date the participant ceases to be eligible to participate in the STD Plan;

- The last day of a leave of absence during which coverage is required by a state-mandated family or medical leave act or law;

- The 90th day of a leave of absence, paid or unpaid, that is approved by UnitedHealth Group in writing, including disability leave; or

- The first day of an unapproved leave of absence.

*Id.* at 51.

B. LTD Plan

The LTD Plan SPD provides that the LTD Plan pays a benefit of 60% of the participant's pre-disability earnings through the participant's sixty-fifth birthday.  *Id.* at 84, 95.  Under the LTD Plan, a participant is disabled when "As a result of a Medical Condition,[6] he is unable to perform with reasonable continuity the Material Duties of his Own Occupation[7] (during the LTD Waiting Period and the initial 24 months of LTD Benefits)

---

[6]"Medical Condition" is defined by the LTD Plan as "Physical Disease, Injury, pregnancy, and/or Mental Disorder and Substance Abuse or Dependence."  *Id.* at 38.

[7]"Own Occupation" is defined by the LTD Plan as "Any employment business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for UnitedHealth Group when your Disability begins. In determining your Own Occupation, the Claims Administrator is not limited to looking at the way you perform your job for UnitedHealth Group, but it may also look at the way the occupation is generally performed in the national economy.  If your Own Occupation involves the rendering of professional services and you are required to have a professional or occupational license in order to work, your Own Occupation is as broad as the scope of your license."  *Id.* at 40.

or Any Occupation[8] (after the initial 24 months of LTD Benefits) . . . . " *Id.* at 36. The LTD Plan SPD states that a participant is not entitled to begin receiving benefits from the LTD Plan until 180 days have passed from the participant's first day of disability. *Id.* at 21. The LTD Plan SPD further states that following thirteen weeks of STD benefits, the administrator will review the STD claim for transition to benefits under the LTD Plan. *Id.* at 34. If it is determined a disability may extend beyond 180 days, the administrator will provide the necessary forms and instructions to apply for LTD benefits or Plaintiff can request the forms or instructions from the administrator. *Id.*

Additionally, if a participant's physician anticipates that the participant's disability will last for 12 months or more, the LTD Plan requires the participant to apply for social security benefits. *Id.* at 26. Benefits from the LTD Plan may be reduced by the amount of benefits a participant receives from Social Security. *Id.*

The Plans' SPD contain a Benefits Overview Section which provides that "UnitedHealth Group, and any other persons or entities to whom UnitedHealth Group delegates fiduciary authority, has the sole and exclusive authority and discretion to interpret the plans' terms and benefits under them, and to make factual and legal decisions about them." (ECF No. 27-3 at 4). In accordance with the terms of the Plans, UnitedHealth delegated its discretionary authority to interpret the plans and make claim determinations to Sedgwick. (ECF No. 27-4 at 66).

---

[8]"Any Occupation" is defined by the LTD Plan as "Any occupation or employment which you are able to perform, whether due to education, training or experience, which is available at one or more locations in the national economy in which you can be expected to earn at least 60% of your Predisability Earnings adjusted for inflation, within 12 months following your return to work, regardless of whether you are working in that or any other occupation." (ECF No. 27-4 at 36).

UnitedHealth self-funds the full cost of basic STD coverage under the STD Plan from its general assets.  (ECF No. 27-3 at 65).  UnitedHealth self-funds the full cost of LTD coverage under the LTD Plan from its general assets for the first 24 months of LTD benefits.  *Id.*  UnitedHealth purchases insurance coverage for LTD benefits that extend beyond the first 24 months from Standard Insurance Company.  *Id.*

Crowley was employed by UnitedHealth as a Provider Specialist from October 31, 2005 until March 4, 2010.  (ECF No. 27-1 at 18).  Crowley's job duties included driving and visiting providers within a 125-mile radius.  *Id.* at 63.  As an employee of UnitedHealth, Plaintiff was a participant in the UnitedHealth's STD Plan and LTD Plan.

**2.  Relevant Medical History**

A. Crowley's Treatment for Anxiety

On June 30, 2009, Crowley was seen by his primary physician, David Murray McInnis, M.D. ("Dr. McInnis")  for complaints of chest pain and left arm numbness, as well as anxiety and stress at his job.  (ECF No. 27-1 at 48).  Crowley advised Dr. McInnis that he had been cited for poor job performance by his supervisor, causing him to have an anxiety attack and chest pain.  *Id.*  Dr. McInnis indicated in his notes that his impression of Crowley's condition was stress reaction and acute anxiety attack.  *Id.*  Dr. McInnis recommended continuing Crowley's Xanax prescription, giving him a one-month leave of absence from work, and stated that "I feel that he needs to work some issues out with his employer."  *Id.*  On July 15, 2009, Dr. McInnis saw  Crowley as a follow-up to his previous visit for stress and anxiety.  *Id.* at 58.  Dr. McInnis indicated in an office note from this visit, "We are still keeping the patient out of work due to anxiety and stress reaction but still states he is not coping too well.*"  Id.*  Dr. McInnis wrote that his impression of Crowley's

6

condition was acid reflux, stress reaction, and anxiety. *Id.* In an office note dated July 27, 2009, Dr. McInnis wrote that he had seen Mr. Crowley again for a follow-up and that Crowley was still complaining of anxiety and having panic attacks. *Id.* Dr. McInnis' impression of Crowley's condition was gastroenteritis, anxiety attacks, and stress reaction. *Id.* Dr. McInnis wrote "I am going to keep the patient out of work for another month and he states that his company wants him to be evaluated by a psychiatrist." *Id.* Dr. McInnis filled out forms excusing Crowley from work from June 30, 2009, until July 30, 2009, and from July 30, 2009 through August 30, 2009, "due to medical reasons." *Id.* at 37, 38.

On July 29, 2009, Dr. McInnis completed an Attending Physician Statement, which Crowley transmitted to Sedgwick, diagnosing Crowley with stress reaction, acute anxiety attack, gastroesophageal reflux disease ("GERD"), and chest pain. *Id.* at 42. In that form, Dr. McInnis indicated that Crowley was totally disabled from work for the period from June 30, 2009, through August 3, 2009, and that Crowley could not work with restrictions during that disability period. *Id.* Dr. McInnis stated that the prescribed treatment plan was "leave of absence from work, resolve issues with employer." *Id.* at 43. He noted that the objective clinical findings warranting total disability were acute anxiety attack and stress reaction. *Id.* at 44.

Previously, Crowley sought treatment from a social worker, Phyllis Peterson Parrish ("Ms. Parrish"), MSW, AACSW, CCSW, for his anxiety. Crowley saw Ms. Parrish on February 25, 2009, March 2, 2009, March 9, 2009, and March 18, 2009. *Id.* at 83. Crowley's only visit to Ms. Parrish after July 1, 2009, occurred on August 18, 2009, when he saw Ms. Parrish for help coping with his anxiety symptoms and with his workplace problems. *Id.*

Ms. Parrish wrote in correspondence dated September 25, 2009, and transmitted to Sedgwick that:

> Mr. Crowley initially contacted me through his employee assistance benefits provided by his employer for support and help with improving his coping skills related to his stress/distress due to an increasingly hostile and conflicted relationship with his direct supervisor at his workplace. Mr. Crowley reported that he has long standing problems with anxiety and agoraphobia. He stated that his employer worked with him regarding his difficulties but that his direct supervisor suddenly began making demands for him to go outside his usual sales territory. He stated that when he tried to talk to her about his agoraphobia, she refused to accommodate and began to give him reprimands . . . . He went to a psychiatric evaluation with a psychiatrist[9] who diagnosed him with panic disorder and agoraphobia but did not recommend medications . . . .

*Id.*

## B. Treatment for Cervical Disc Problems

Dr. McInnis saw Crowley on August 27, 2009, for complaints of neck, shoulder, arm, and back pain. *Id.* at 74. Crowley stated that his left fingers felt numb at times. *Id.* He also complained of some anxiety symptoms. *Id.* Dr. McInnis indicated that his impression of Crowley's condition was cervical disc disease, spinal cervical stenosis, possible fibromyalgia, stress reaction, and panic attacks. Id.

On September 16, 2009, Crowley returned to Dr. McInnis' office complaining of neck pain and left shoulder pain radiating down the arm. *Id.* at 84. Dr. McInnis wrote that his impression of Crowley's condition was cervical disc disease with left radiculitis, cervical spinal stenosis, and anxiety disorder. *Id.* at 85.

On October 8, 2009, Crowley was seen by a specialist, Dr. W.S. Edwards, Jr. for his complaints of neck pain. (ECF No. 27-2 at 21). Dr. Edwards stated that an x-ray of

---

[9]There is no other evidence in the administrative record about Crowley seeing a psychiatrist or receiving any type of psychiatric evaluation other than Ms. Parrish's statement.

Crowley's cervical spine showed degenerative changes at C5-6 and an MRI scan on October 8, 2008, demonstrated disc protrusion at C5-6. *Id.* Dr. Edwards diagnosed Crowley with cervical herniation of C5-6 with left cervical radiculopathy, and wrote, "New MRI scan is recommended given the worsening of his clinical symptoms. He is likely going to require surgical intervention depending on those findings. He is unable to work at this time." *Id.* at 22. Crowley underwent another MRI on October 13, 2009, which indicated mild central stenosis and moderate bilateral foraminal stenosis due to spondylosis at the C5-6 level. *Id.* at 23. On November 19, 2009, Crowley underwent surgery, for cervical disk herniation with left cervical radiculopathy. *Id.* at 27-28.

In a post-operative examination note dated December 1, 2009, Dr. Edwards noted that Crowley had tolerated the surgery well, his incision site had healed, his motor strength and reflexes were good, his gait was normal, and his bone grafts and cervical plating remained excellent. *Id.* at 30. Dr. Edwards indicated that Crowley was unable to return to work until further notice. *Id.* at 31. Thereafter, on January 12, 2010, in a post-operative examination note Dr. Edwards wrote that Mr. Crowley could return to work without restrictions on January 18, 2010. *Id.* at 33.

### 3.    Claims History

Crowley's first day of absence from work was July 1, 2009. (ECF 27-1 at 18). He filed a claim that same day for STD benefits. *Id.* at 24. The basis of that claim was anxiety and stress-related chest pain.[10] *Id.* at 18. On July 6, 2009, Sedgwick denied Crowley's

---

[10]The July 1, 2009, disability report for Crowley (claim number 300907520700001) states that his diagnosis is unknown and does not indicate the medical condition for which he claimed disability. (ECF No. 27-1 at 24). A subsequent disability claim number was generated on July 22, 2009. Id. at 18. That disability claim number is also for the period beginning on July 1, 2009 (claim number 300907781080001). *Id.* It describes Crowley's injuries as anxiety and

claim for STD benefits due to it being work-related and because he had filed a workers' compensation claim for the same condition for which he was seeking STD benefits. *Id.* at 30. The STD Plan does not pay disability benefits for work-related conditions. *Id.* at 30.

On July 27, 2009, Crowley's workers' compensation claim based on his anxiety was denied. *Id.* at 9. UnitedHealth's protocol is that if a STD claim is denied, and then a claim for workers' compensation benefits based on the same medical condition is subsequently denied, the STD claim will be reopened and reviewed again by Sedgwick. Thus, after Crowley's workers' compensation claim was denied, Sedgwick reopened Crowley's STD claim.

In the course of its review of Crowley's STD claim, Sedgwick considered the medical records that Crowley submitted to it, including an attending physician statement from Dr. McInnis dated July 28, 2009, and out of work notes from Dr. McInnis dated June 30, 2009, and July 27, 2009. On August 18, 2009, Sedgwick sent Crowley a second denial letter regarding his STD claim for the period beginning July 1, 2009. *Id.* at 49. Sedgwick reasoned that the medical information submitted did not demonstrate that Crowley was unable to perform the material duties of his own occupation or that he was in active treatment with a mental health provider, as required by the STD Plan for participants with mental disorders. *Id.*

---

stress-related chest pains. *Id.* It also states that Crowley's first day of absence from work was July 1, 2009. *Id.* Although two different disability claims reports were thus generated for the same claims period, all subsequent correspondence references the original July 1, 2009, claim number (300907520700001). The second claim was generated because Crowley called in a second claim. However, UnitedHealth only permits participants to have one STD claim open for a given time period. Thus, the second claim was opened in error. The fact that the second claim had been opened in error was communicated to Crowley. It is clear from Crowley's subsequent correspondence with Sedgwick and from the medical record that Crowley's July 1, 2009, claim was based on anxiety and chest pain.

Crowley appealed Sedgwick's initial denial of his STD claim on August 26, 2009.

*Id.* at 56.  In his appeal form, Crowley stated in part as follows:

> My job requires me to drive & visit providers within a 125 mile radius.  Due to the panic attacks, anxiety & having to take Xanax [sic] 0.5 MG 3 times a day makes it a risk to myself & others to be on the road performing the duties required.  I also don't sleep good at night causing me to be sleepy during the day, along with the Xanax [sic] . . .

> *Id.*

On August 28, 2009, Plaintiff's counsel, Ms. Pheobe A. Clark ("Ms. Clark"), wrote to Sedgwick, advising that her office would be representing Crowley and requesting that her letter serve as an appeal of the denial of Crowley's benefits.  *Id.* at 62.  Ms. Clark asserted that the basis for the appeal was that Crowley was suffering from anxiety attacks and bulging discs aggravated by stress.  *Id.* Also, on August 28, 2009, Ms. Clark submitted a letter to Sedgwick in which she requested that said letter serve as a claim for LTD benefits on behalf of Mr. Crowley.  *Id.* at 11.

Sedgwick acknowledged receipt of Crowley's appeal of his claims for STD benefits on September 2, 2009.  *Id.* at 61.  Sedgwick forwarded the medical records Crowley had provided it to two independent reviewing physicians, Robert D. Petrie, M.D. ("Dr. Petrie"), a board-certified specialist in Occupational and Environmental Medicine and Mark Webb, M.D. ("Dr. Webb"), a board-certified specialist in Psychiatry & Neurology.  *Id.* at 90-97.  In the External Physician Advisor Referral Form that accompanied those records, Sedgwick stated that Crowley was a provider service specialist and that his regular job description was as follows: "sit type talk, travel includes driving, walking, carry up to 5lbs [sic]."  *Id.* at 87.

Dr. Petrie reviewed Crowley's claim based upon the medical records provided to

Sedgwick by Crowley, including Crowley's claim log from July 1, 2009, through October 2, 2009, Dr. McInnis' progress notes regarding Crowley from June 30, 2009 through September 16, 2009, Ms. Parish's progress notes from September 25, 2009, other miscellaneous records dated August 26, 2009, through October 5, 2009, and a telephone conference with Crowley's treating physician, Dr. McInnis.  *Id.* at 90.  Dr. Petrie noted regarding his teleconference with Dr. McInnis that Dr. McInnis had advised him that the main reason why Crowley was unable to work was due to anxiety and panic attacks and that Crowley was having 'issues with his employer'.  *Id.*  In his October 9, 2009, report, Dr. Petrie noted that  Crowley was not disabled for the period from July 1, 2009, going forward.  Dr. Petrie further noted that:

> From an occupational medicine perspective, the complaints of abdominal pain, chest pain, and upper back pain do not have associated medical objective findings to establish impairments that would interfere with regular work activities.

*Id.* at 90-91.

Crowley's STD claim was also independently reviewed Dr. Mark Webb.  Dr. Webb's review of Crowley's claims was based on the same medical records reviewed by Dr. Petrie.  *Id.* at 93.  Dr. Webb also attempted to contact Mr. Crowley's treating physician, Dr. McInnis and Ms. Parrish but was unable to do so.  *Id.*  Dr. Webb found that the medical record did not support Crowley's claim of disability from July 1, 2009, going forward.  In making this conclusion, Dr. Webb relied upon the following information from Crowley's medical records:

- Crowley only saw his mental health specialist once;

- Crowley's symptoms were not severe;

- Crowley had longstanding problems with anxiety and was receiving minimal treatment;

- •  Crowley was never referred to a psychiatrist;

- •  There was no mention of any lack of functioning in the community; therefore he could function at work;

- •  Crowley's medications were not changed, which highlights his symptoms are stable and chronic and not disabling.

*Id.* at 94-95.

On October 19, 2009, Sedgwick sent correspondence to Crowley's attorney, Ms. Clark, advising her of its decision to uphold the denial of Crowley's claim for STD benefits. *Id.* at 96.  Sedgwick based its decision on the fact that the medical record did not indicate that Crowley was unable to perform the material duties of his own occupation, and because his medical conditions were work-related, which precluded recovery of STD benefits under the terms of the STD Plan.  *Id.*  Sedgwick stated that in reaching its decision, it had reviewed medical documentation from Crowley's treating physician, Dr. McInnis and Ms. Parrish dated June 30, 2009,through September 25, 2009.  *Id.*  Sedgwick stated that it had also relied on the reports of two independent reviewing physicians, Dr. Petrie and Dr. Webb, who had found that Crowley was not disabled.

On November 6, 2009, Crowley's attorney, Ms. Clark, sent correspondence to Sedgwick stating that the denial of Crowley's STD claim for anxiety, panic, and stress was unreasonable in light of the fact that he had previously been approved for STD benefits based on those conditions.  (ECF No. 27-2 at 4-5.)  Ms. Clark noted that UnitedHealth had approved STD benefits for Crowley for the period from October 30, 2008, through December 1, 2008, based on cervical spinal stenosis, and from February 20, 2009, through April 20, 2009, for anxiety, stress, and panic attacks.  *Id.*  Ms. Clark enclosed medical records regarding Crowley's previous leaves of absence.  *Id.* at 6-7.  On December 1,

2009, Sedgwick responded to Ms. Clark's November 6, 2009, correspondence, stating that its October 19, 2009, decision upholding its denial of Mr. Crowley's STD claim was final. *Id.* at 18.

On February 19, 2010, Ms. Clark sent additional medical records regarding Crowley to Sedgwick. *Id.* at 20. Those medical records related to Crowley's surgery for his herniated disks that occurred in November of 2009 and the pre-operative and post-operative care he received in association therewith. *Id.* at 21-23. This was the first time that those medical records had been transmitted to Sedgwick. On March 4, 2010, Sedgwick responded to Ms. Clark's February 19, 2010, correspondence, again stating that its October 19, 2009, decision upholding its denial of STD benefits was final. *Id.* at 36.

## CONCLUSIONS OF LAW

Under the abuse of discretion standard of review applicable to this action, Sedgwick's decision upholding its denial of Crowley's STD claim must be affirmed because that decision was the result of reasonable and principled analysis of the medical record before it, and the terms of the STD Plan was based upon substantial evidence that included the reports of two independent physicians, who each determined that Crowley was not disabled. Although Crowley had surgery for herniated discs, which could have caused him to become disabled, his surgery did not occur until after Sedgwick had given its final decision upholding its denial of Crowley's STD claim. In addition, Crowley did not become eligible for LTD benefits under the terms of LTD Plan because that Plan contains a prerequisite that the participant is disabled for 180 days before he or she is eligible for LTD benefits. Further, Crowley failed to properly apply for LTD benefits, thus Crowley's claim for LTD benefits is denied.

14

**1. Applicable Standard of Review**

It is undisputed that the benefits at issue in this case are provided under Plans governed by ERISA. Crowley's claim for benefits is therefore pursued solely under 29 U.S.C. § 1132 (a)(1)(B). It is also undisputed that the Plans' benefits determination is subject to an abuse of discretion standard of review. (ECF No. 27 at ¶ 3).

Under the abuse of discretion standard of review, the court is required to uphold the administrator's decision if it is reasonable, even if the court would have come to a different conclusion had it considered the matter independently. *See Smith v. Con'l Cas. Co.,* 369 F.3d 412, 417 (4th Cir. 2004). A decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Johnson v. Michelin No. Am.,* 658 F. Supp.2d 732, 741 (D.S.C. 2009) (*citing*) *Ellis v. Metro. Life. Ins. Co.,* 126 F.3d 228, 232 (4th Cir. 1997*).* Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion," *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011) (*quoting LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir.1984)), and "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance," *LeFebre*, 747 F.2d at 208 (*quoting Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir.1966)). Additionally, under the abuse of discretion standard, the reviewing court must generally determine whether a plan administrator's decision was reasonable based upon the evidence before it.

Numerous factors are considered in "determining the reasonableness of a fiduciary's discretionary decision.*" Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000). These include such factors as:

(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to

15

which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Id.*

It is the claimant's burden to establish his entitlement to benefits under the Plan. *Elliott v. Sara Lee Corp*, 190 F.3d 601, 603 (4th Cir. 1999).

A conflict of interest exists where a plan administrator serves the dual role of evaluating claims for benefits and paying the claims. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Here there was no conflict of interest present that would potentially render Sedgwick's decision less reasonable since UnitedHealth self-funds STD benefits under the STD Plan, and self-funds LTD benefits under the LTD Plan for the first 24 months of LTD benefits, after which those benefits are insured by Standard Insurance Company. (ECF No. 27-3 at 65). Further, in accordance with the terms of the Plans, UnitedHealth delegated its discretionary authority to interpret the Plans and make claim determinations to Sedgwick. (ECF 27-4 at 66). Thus, Sedgwick was not operating under a conflict of interest when it made the decision to uphold its denial of Crowley's claim for STD benefits. *See Lance v. Ret. Plan of Int'l Paper Co.*, 331 Fed.App'x. 251, 2009 WL 1497493 (4th Cir. May 29, 2009), 2009 U.S. App. LEXIS 11460, *1, *9 (4th Cir. May 29, 2009) (finding no conflict of interest where a retirement plan delegated its claims administration duties to Sedgwick).

## 2. Denial of STD Claim.

The evidence establishes that Sedgwick's decision to uphold the denial of Crowley's STD claim was reasonable and proper, in that it was consistent with the terms of the Plans,

it was the result of principled decision making, and it was supported by substantial evidence.

A.  STD Claim based on Anxiety and Chest Pain

Sedgwick's decision to deny Crowley's STD benefits claim based upon anxiety and chest pain was reasonable and proper.  After receiving notice of Crowley's STD claim, Sedgwick reviewed the medical records submitted by Crowley in support of that claim.  More specifically, Sedgwick reviewed Dr. McInnis' diagnosis of Mr. Crowley with stress reaction, acute anxiety attack, GERD, and chest pain, and his conclusion that Mr. Crowley was totally disabled from June 30, 2009, through August 3, 2009.  (ECF No. 27-1 at 42).     Sedgwick also considered the terms of the STD Plan, which states that for a participant to be disabled, he or she must be unable "to perform with reasonable continuity the Material Duties of . . . [his or her] . . .Own Occupation because of a non-work related Medical Condition." *Id.* at.49. In addition, Sedgwick considered the STD Plan's requirement that in order to qualify for STD benefits, (1) the participant must have been seen face-to-face by a physician about his or her disability within 10 business days of the first day of absence related to the disability leave of absence; (2) the participant's physician must have provided medical evidence that supports the participant's inability to perform the material duties of his or her occupation; (3) the participant must be under the regular and appropriate care of a physician; and (4) the disability must not be work-related and must be a medically determinable impairment.  (ECF No. 27-4 at 53).  Sedgwick also considered the fact that if a participant is claiming benefits due to a mental disorder, the STD Plan requires that the participant be in active treatment with an independently licensed mental health provider.  (ECF No. 27-1 at 49).

Upon review, Sedgwick properly denied Crowley's claim for STD because the medical information submitted by Dr. McInnis did not demonstrate that Crowley was unable

to perform the material duties of his occupation, and because Crowley failed to submit medical documentation showing that he was in active treatment with a mental health provider. *Id.* The record reflects that Sedgwick also undertook a full and fair review of Crowley's appeal of its initial denial of his STD claim.

On appeal, Sedgwick reviewed all medical documentation submitted by Crowley to Sedgwick up to that point in time, including documentation from Dr. McInnis and social worker Ms. Parrish. *Id.* at 96. Sedgwick also engaged an independent reviewing physicians, Dr. Webb and Dr. Petrie, to review Crowley's medical file who both came to the reasonable conclusion that Mr. Crowley was not disabled from performing the material duties of his job.

As set forth previously, Dr. Webb reviewed Plaintiff's psychiatric history and noted that his medications were not changed or added to, which highlighted the fact that Plaintiff's symptoms were stable and chronic, and not disabling. *Id.* at 94-95. Reviewing his report as a whole, and keeping in mind that Dr. Webb limited his review of Mr. Crowley's records to his area of expertise (psychology), it is obvious that Dr. Webb was referring to Xanax, the only psychiatric medication that Mr. Crowley was taking when he noted that Crowley's medications were not changed. *Id.* He observed in his report that Mr. Crowley's Xanax dose remained unchanged for the duration of the review period. *Id.* Crowley suggests his medication had changed and that he was prescribed an increased dose of Lyrica (given for neuropathic pain), and Flexiril (a muscle relaxer), for muscle spasms. However, neither of those drugs are psychiatric medicines. Thus, the fact that Dr. Webb stated that Mr. Crowley's medications remained unchanged, when considered in context, does not render

his opinion unreasonable.[11]  Instead, the evidence reflects that Dr. Webb's analysis was reasonable and Sedgwick's reliance on it demonstrates a deliberate, principled reasoning process.  Further, it was not an abuse of discretion for Sedgwick to deny benefits where conflicting medical reports were presented.  *See The Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003) (stating that nothing in ERISA ". . . suggests that plan administrators must accord special deference to the opinions of treating physicians.  Nor does . . . [ERISA] . . . impose a heightened burden of explanation on administrators when they reject a treating physician's opinion"); *Spry v. Eaton Corp. Long Term Disability Plan*, 326 Fed.App'x. 674, 2009 WL 1524934 (C.A.4 (S.C.)) 2009 U.S. App. LEXIS 11786, *1, *14 (4th Cir. June 2, 2009).

Sedgwick's decision to deny Crowley's instant claim for STD benefits based on anxiety was reasonable even though Sedgwick had previously granted a claim Crowley submitted for STD benefits based on anxiety and panic attacks for the period from February 27, 2009, through April 20, 2009.  (ECF No. 27-2 at 72-27).  The record reflects that at the earlier time when Crowley received STD benefits, he was under the care of a psychiatrist.  (ECF No. 27-2 at 86-89).  The psychiatrist prescribed Lexapro, an anti-depressant, for Crowley to take as well as Xanax.  *Id.* at 88.  In addition to psychiatric treatment, Crowley improved to the point that he was cleared to return to work on April 20, 2009.  *Id.* at 83. Plaintiff did so and worked up until June 30, 2009.  *Id.* at 18.

Conversely, during the time period from July 1, 2009 forward, that is the subject of this lawsuit, Crowley was only under the care of his general practitioner and a social worker, whom he saw once.  *Id.* at 93.  He did not see a psychiatrist or a psychologist.  *Id.* at 94.

---

[11]Crowley disputed Dr. Webb's assertion that his medications had not changed.

In addition, during the time period from July 1, 2009 forward, he was only taking Xanax, and was not prescribed Lexapro.  *Id.* at 93-94.  In light of the differences between the two disability periods, and Crowley's intervening time on the job, the disability period from February through April of 2009 is not probative of Crowley's condition in July 2009.  Thus, Sedgwick's decision to uphold its denial of Crowley's claim for STD benefits based on anxiety was reasonable, in that it was consistent with the terms of the STD Plan, it was the result of principled decision making, and it was supported by substantial evidence.

B. Denial of STD Claim regard to  Cervical Disc Condition.

The record reflects that Crowley originally claimed STD benefits based on anxiety and chest pain.  In August 2009, Sedgwick received notice that Crowley had a cervical disc condition for which he was claiming STD benefits as well.  On August 28, 2009, in a letter appealing the denial of Crowley's claim for benefits, Crowley's attorney, Ms. Clark, wrote that the basis for the appeal was that Crowley suffered from anxiety attacks and bulging discs aggravated by stress.  (ECF No. 27-1 at 1).  On September 24, 2009, in support of Crowley's appeal of his denied STD claim, Ms. Clark faxed Sedgwick medical records which included an office note from Dr. McInnis dated August 27, 2009, in which Dr. McInnis wrote that his impression of  Crowley's condition included cervical disc disease and spinal cervical stenosis.  *Id.* at 68, 74.  Then, on September 29, 2009, Ms. Clark again faxed medical records to Sedgwick containing an office note from Dr. McInnis dated September 16, 2009, again stating that his impression of Crowley's condition was cervical disc disease and spinal cervical stenosis.  *Id.* at 82, 84-85.  On October 19, 2009, Sedgwick notified Ms. Clark of its decision to uphold the denial of Crowley's claim for STD benefits.  *Id.* at 96.

At the time that Sedgwick made its final determination regarding Crowley's appeal

on October 19, 2009, the only medical records that it had before it regarding Crowley's disc problems were August 27, 2009, and September 16, 2009, office notes from Dr. McInnis diagnosing Crowley with cervical disc disease and spinal cervical stenosis. *Id.* at 68, 74, 82, 84-85. The notes do not contain any objective medical evidence, such as a functional capacity test or an MRI, to substantiate Dr. McInnis' diagnosis that Crowley was unable to perform the material duties of his occupation, and was thus disabled, due to those conditions.

Dr. Petrie independently reviewed Crowley's file, which included Dr. McInnis' August 27, 2009, and September 16, 2009, diagnosis of cervical disc disease and spinal cervical stenosis. Dr. Petrie also held a teleconference with Dr. McInnis in which Dr. McInnis stated that the main reason Crowley was not returning to work was due to anxiety, panic attacks, and issues with his employer. *Id.* at 90. Dr. McInnis also stated that he believed that Crowley's complaint of left arm numbness was stress-related and was not due a physical condition. *Id.* Based upon the evidence within the record, Dr. Petrie found from an occupational medicine prospective that Crowley's upper back pain did not have associated medical objective findings to establish impairments that would interfere with regular work activities." *Id.* at 90-92. Dr. Petrie's opinion that Crowley was not disabled was reasonable. (ECF No. 29 at 10).

In formulating his opinion, Dr. Petrie agreed with Crowley's treating physician, Dr. McInnis, that there were no cardiovascular or neurological conditions; he did not disregard that opinion. *Id.* at 90-91. Dr. Petrie credited the reliable medical evidence found in the medical records throughout. *See Gorski v. ITT LTD Plan for Salaried Employees*, 314 Fed.App'x. 540, 2008 WL 4790117 (C.A.4 (N.C.)) __ Fed. Appx. __, 2008 U.S. App. Lexis

22904 (4th Cir. 2008) (unpublished opinion) (fiduciary need not agree with but must credit plaintiff's credible medical evidence).

Sedgwick's decision to deny Crowley's claim for STD benefits based on his cervical disc condition was reasonable even though Crowley had been previously approved for STD benefits for the period from October 30, 2008 through November 25, 2008 for a cervical disc condition. (ECF No. 29 at 10). Crowley's 2008 cervical disc condition was different from his 2009 claim. In 2008, Crowley was diagnosed with cervical herniated nucleus pulposus[12] at C5-6 with left cervical radiculopathy. (ECF 27-2 at 13-17 & 23-28). Objective medical evidence in the record, an MRI *(Id.* at 23-24), supported this diagnosis whereas, in his 2009 claim for STD, there is no objective medical evidence in the record to support Crowley's diagnosis of cervical disc disease with left radiculitis and cervical spinal stenosis. (ECF No. 27-1 at 85). Additionally, in 2008, Crowley was treated by an orthopedic surgeon whereas in 2009, Crowley was being treated by his regular physician, Dr. McInnis. (*Id.* at 85 & ECF No. 27-2 at 55) In addition the medications prescribed for the 2008 claim and the 2009 claim were different. Dr. Edwards prescribed a Medrol dose pack in association with Plaintiff's 2008 condition, while Dr. McInnis prescribed Flexiril in association with his 2009 condition. *Id.* at 85, 154. Further, Dr. McInnis told reviewing physician Dr. Petrie that Plaintiff's 2009 condition was attributable to stress, while there was no such indication with regard to Plaintiff's 2008 condition. *Id.* at 90. Furthermore, following Plaintiff's period of disability from October to November of 2008, Plaintiff was cleared to return, and did in fact return to work. *Id.* at 143. The first medical records associated with Plaintiff's disc condition

---

[12]Taber's Cyclopedic Medical Dictionary defines "herniated nucleus pulposus" as "Prolapse of the nucleus pulposus of a ruptured invertebral disk into the spinal canal." Taber's Cyclopedic Medical Dictionary 986 (20th Ed. 2005).

that is the subject of this litigation are dated August 27, 2009, approximately 9 months later. *Id.* at 74.  Given the time that had passed between Crowley's return to work in November of 2008 and Crowley's visit to Dr. McInnis in August of 2009, and the difference in diagnoses, treating physicians, and treatment between the 2008 condition and the 2009 condition, it was not unreasonable for Sedgwick to conclude based on the medical evidence before it that Crowley's cervical disc condition was not disabling.

Further, Sedgwick did not receive the medical records regarding Crowley's 2009 disc surgery and the pre-operative and post-operative care associated therewith until February 2010, several months after Sedgwick's October 2009 decision to uphold the denial of Crowley's claim. *Id.* at 117-30.  Because that evidence was not before Sedgwick when it made its final decision to uphold its denial of Crowley's STD claim, this Court may not consider it.  *Id.* at 96.  *See Donnell v. Metro. Life Ins. Co.*, 165 Fed.Appx. 288, 2006 WL 297314 (C.A.4 (Va.)) 2006 U.S. App. LEXIS 3073, *1, *16 n.8 (4th Cir. Feb. 8, 2006) (refusing to consider a functional capacity test and other evidence that was submitted to a plan administrator after its final denial of plaintiff's appeal, and stating "MetLife's decision must stand or fall based on the evidence that was before it at the time") (internal citations and quotations omitted); *see also Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608 (4th Cir. 1999) ("When a district court reviews a plan administrator's decision under the abuse of discretion standard, an assessment of the reasonableness of the administrator's decision must be based on the facts known to it at the time") (internal citations and quotations omitted).

Further, Crowley was not covered under the STD Plan at the time that he underwent surgery in 2009. The STD Plan SPD states that:

> Your coverage under the STD Plan automatically ends on the earliest of . . . [t]he 90th day of a leave of absence, paid or unpaid, that is approved by UnitedHealth Group in writing, including Disability leave . . . ."

(ECF No. 27-4 at 51).

Crowley's first day of absence from work was July 1, 2009.  (ECF No. 27-1 at 24). Ninety days following July 1, 2009, was September 29, 2009.  Crowley did not undergo surgery until November of 2009, which was outside of the 90-day period following his first day of absence from work.  (ECF No. 27-2 at 28).  Thus, Crowley was not covered under the STD Plan at the time he underwent surgery for herniated discs.

In summary, Sedgwick's decision upholding its denial of Crowley's claim for STD benefits shall be affirmed with regard to Crowley's disc condition because: (1) none of the medical records provided to Sedgwick at the time it made its final decision on appeal evidenced that  Crowley was disabled from any cervical disc condition; (2) an independent reviewing physician affirmatively found that Crowley was not disabled due to any cervical condition; (3) Crowley did not have disc surgery, and did not submit medical records related thereto until after Sedgwick had already made its final benefits determination on appeal; and (4)  Crowley was no longer covered under the STD Plan at the time he underwent disc surgery.

### 3. **Application for LTD Plan**,

On August 28, 2009, Crowley's counsel, Ms. Clark, sent a letter asking that said letter be accepted as Crowley's claim for LTD benefits.  (ECF No. 27-1 at 11). Defendants did not respond to Ms. Clarks's letter.

29 C.F.R. § 2560.503-1(f)(3) requires that  "In the case of a claim for disability benefits, the plan administrator shall notify the claimant . . . if the plan's adverse benefit

determination within a reasonable period of time, but not later than 45 days after receipt of the claim by the plan."  In addition, 29 C.F.R. § 2560.503-1(l) provides that "In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act . . . .  However, 29 C.F.R.  § 2560.503-1(e) provides that "For purposes of this section, a claim for benefits is a request for a plan benefit or benefits made by a claimant **in accordance with a plan's reasonable procedure for filing benefit claims**" (emphasis added).  Here, Crowley's purported LTD claim was not made in accordance with the LTD Plan's reasonable procedures for filing such a claim, and therefore did not constitute a "claim" subject to the requirements of 29 C.F.R. § 2560.503-1(f)(3) or the rights embodied in 29 C.F.R. § 2560.503-1(l).

The LTD Plan SPD plainly states that following thirteen weeks of STD benefits, the administrator will review the STD claim for transition to benefits under the LTD Plan.  (ECF No. 27-4 at 33).  If it is determined a disability may extend beyond 180 days, the administrator will provide the necessary forms and instructions to apply for LTD benefits or Plaintiff can request the forms or instructions from the administrator.  *Id.*  Thus, the earliest a claim will be reviewed for possible transition to benefits under the LTD Plan is after the claimant receives 13 weeks of STD benefits.  Plaintiff's purported "submission" of an LTD claim through the August 28, 2009, letter of his lawyer, came less than 8 weeks into the STD period.  (ECF No. 27-1 at 11).  In this matter, the administrator never reviewed Plaintiff's claim for transition to LTD benefits because Plaintiff was never approved for STD benefits, and thus never received the 13 weeks of STD benefits that are a prerequisite for

beginning the process of transition to LTD benefits.  (See ECF No. 27-1 at 89).  The administrator therefore did not provide Plaintiff with the forms to apply for LTD benefits, and Plaintiff was not entitled under the LTD Plan to request those forms.  (See ECF No. 27-4 at 89, 102).  Additionally, because Plaintiff's letter from his attorney demanding LTD benefits was not submitted in conformance with the LTD Plan using the forms provided by the Plan administrator, it did not constitute a valid claim for LTD benefits.  See *Id.* at 102.

Further, even if Plaintiff had submitted a proper claim for LTD benefits, Plaintiff would not have been entitled to such benefits under the terms of the LTD Plan.  The LTD Plan provides that a participant is not entitled to begin receiving LTD benefits until 180 days have passed from the participant's first day of disability.  *Id.* at 89.  This 180-calendar day period is the LTD Waiting Period.  *Id.*  The LTD Plan provides that a participant is disabled when "As a result of a Medical Condition, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation (during the LTD Waiting Period and the initial 24 months of LTD Benefits) or Any Occupation (after the initial 24 months of LTD Benefits) . . . . *Id.* at 104.

Participants who are denied STD benefits or who receive STD benefits for less than the 180 day period are not considered for LTD benefits, because they will necessarily be unable to satisfy the LTD Waiting Period and the LTD Plan's definition of disability.  See *Id.* at 89, 102, 104.  Because Crowley's STD benefits claim was denied, he was not eligible for, and was not considered for LTD benefits.

D. Claim for Attorney's Fees and Costs

29 U.S.C. § 1132(g)(1) provides that "[i]n any action under this title . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable

attorney's fee and costs of action to either party."  The U.S. Supreme Court limited the breadth of courts' discretion in awarding such fees and costs in *Hardt v. Reliance Standard Life Ins. Co.* when it held that:

> . . . a fees claimant must show some degree of success on the merits before a court may award attorney's fees under § 1132(g)(1) . . . .  claimant does not satisfy that requirement by achieving trivial success on the merits or a purely procedural victor[y] but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquir[y] into the question whether a particular party's success was substantial or occurred on a central issue.

130 S. Ct. 2149, 2158 (2010) (internal citations and quotations omitted).  In this matter, Crowley is not entitled to any form of relief on the merits and, as such, he is also not entitled to an award of attorney's fees and costs under 29 U.S.C. § 1132(g)(1).

## CONCLUSION

Based upon the foregoing, it is the opinion of the court that Sedgwick did not abuse its discretion in denying Crowley benefits.  Accordingly, UnitedHealth and Sedgwick are entitled to judgment.  Crowley's claims are Dismissed with prejudice.  Further, the court declines to award attorney's fees.  The Clerk is directed to enter judgment for Defendants.

**IT IS SO ORDERED**.

/s/Mary G. Lewis
United States District Judge

September  27,  2013
Florence, South Carolina